# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

TAMALA MASTERS,                     :

     Plaintiff,                     :

                             Case No. 3:14cv00337

 vs.                     :

                             District Judge Thomas M. Rose

CAROLYN W. COLVIN,                     :    Chief Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,                     :

     Defendant.                     :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    <u>Introduction</u>

Plaintiff Tamala Masters asserted in her application for Disability Insurance Benefits that she was under a benefits-qualifying disability starting on March 10, 2008 due to cervical degenerative disc disease, thoracic degenerative disc disease, lumbar degenerative disc disease, arthritis, bulging discs, fibromyalgia, depression, high blood pressure, and asthma. (Doc. #5, *PageID* #315). The Social Security Administration denied Plaintiff's application based mainly on the conclusion that she was not under a "disability," as the term is defined in the Social Security Act.

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff brings the present case challenging both the conclusion that she was not under a disability and the resulting denial of her application for Disability Insurance Benefits.  The case is presently pending upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff Reply (Doc. #15), the administrative record (Doc. #5), and the record as a whole.

Plaintiff seeks an Order remanding this matter for payment of benefits.  The Commissioner asks the Court to affirm the Social Security Administration's decision to deny Plaintiff's application for benefits.

## II.   <u>Background</u>

### A.   <u>Plaintiff and Her Administrative Proceedings</u>

Plaintiff was 52 years old on her date last insured (March 31, 2012), placing her in the category of a "person approaching advanced age" for Social Security purposes.  *See* 20 C.F.R. § 404.1563(d).  She has an 11th grade education and worked in the past as a receptionist clerk.

Plaintiff's application for benefits was denied on two occasions, once by Administrative law Judge (ALJ) Carol Bowen (Doc. #5, *PageID* #s 136-49) and later by ALJ Amelia G. Lombardo, *id*. at 42-56.  This occurred as follows.

### 1.

ALJ Bowen held a hearing (June 2011) during which Plaintiff testified that she cannot work due to pain from degenerative disc disease throughout her spine with arthritis.

2

*Id*. at 1-04. She cannot use her arms and hands very well. *Id*. at 104. She noted that he had surgery to replace two discs in her neck. She also has pain from both her hip to her knees, and she has fibromyalgia that "is not very well under control." *Id*. at 104, 106. She takes medication – Lyrica – for fibromyalgia but it does not work very well. Lyrica causes her to swell and gain weight. *Id.* at 106.

Plaintiff explained that she has been diagnosed with carpal tunnel syndrome for which she has received injections, and she wears braces at night. She has limited ability to turn her neck. She is in "pain all the time" in her back and neck. *Id*. at 107. Her pain gets worse with activity. To relieve her pain, she sits or lies down, and she does neck exercises and yoga at home. *Id*. She has difficulty getting up and moving because it "hurts real bad." *Id*.

As to her daily activities, Plaintiff testified that she helps get her granddaughter off to school, then does "the best she can" to straighten up the house and usually watches TV. *Id*. at 108. She also does the best she can doing laundry and putting dishes in her dishwasher. She does not do yard work or run the sweeper. Her son performs the yard work, and she cooks sometimes. *Id.* Plaintiff does not go grocery shopping by herself. She cannot move items from her cart to her car or carry bags into her home. She has no trouble dressing or bathing. *Id*. at 109.

Plaintiff reported that she sleeps an average of at most four hours a night even with medication. Many nights, she is only able to sleep one hour. *Id*. Plaintiff's husband takes

care of paying household bills and reading the mail.  *Id*. at 110.  She has a large extended family, and they "have quite a household all the time stopping by."  *Id*. at 111.  But she lacks friends or social connections.  She traveled to Las Vegas with her husband four months before the ALJ's hearing.

   Plaintiff owns a computer but only uses it for about 15 minutes because her hands go numb and become cold.  *Id*. at 110, 114.  Cooking hurts her hands, and she cannot do things like holding a frying pan long enough to turn it sideways to drain it.  *Id*. at 116.  She avoids all chores or hand-related activities on her "bad pain days," which can occur on average three to four days per week.  *Id*. at 117.

ALJ Bowen based her conclusion that Plaintiff was not under a disability on her finding that Plaintiff could perform a limited range of light work, and "she can perform frequent handling, fingering, and feeling with no forceful gripping...."  *Id*. at 142.

The Social Security Administration's Appeals Council reviewed ALJ Bowen's decision and identified two reasons for finding that further consideration by an ALJ was warranted.  The Appeals Council noted first that it had received new evidence, including an opinion from treating physician Eugene Kim that Plaintiff was limited to occasional handling and fingering.  The Appeals Council also observed that Dr. Kim relied on an EMG report dated May 17, 2011 and his treatment notes and concluded that further consideration of Plaintiff's manipulative limitations was warranted.  *Id*. at 156.

The Appeals Council next found that "supplemental vocational expert testimony is

needed to clarify that effect of the manipulative limitations on the light occupational base." *Id*. at 157.

## 2.

On remand from the Appeals Council, ALJ Lombardo held a hearing (January 2013) during which Plaintiff testified.  She explained that she quit her last job in 2006 "[b]ecause the pain was getting so bad I couldn't stand sitting there anymore ...."  (Doc. #5, *PageID* #69).  She had previously had carpal tunnel surgery on both hand in approximately 1985.  *Id*. at 71.

Plaintiff's hand specialist, Dr. Kim, advised against additional surgery, noting there was only a 25% chance a second surgery would help her hands and a "very large chance" that more surgery would make her hands worse.  *Id*. at 70-71.  When asked why Dr. Kim's records state she was discharged from his practice for not pursuing additional injections or surgery, Plaintiff explained that it was her understanding that she could only have three injections for her "whole entire life time," so she didn't want have another injection at her age.

Plaintiff testified that her hands cramp up when she tries to "do too much," and she loses all strength in her hands.  *Id*. at 71-72.  She noted, "If I try to carry too heavy an object, my hands it's just lets [sic] go...."  *Id*. at 72.  She no longer used a computer and stopped in about 2010.  She is able to dress herself, but she cannot write a letter or carry anything heavy.  *Id*. at 75.  Just holding the phone causes her hands to cramp.  *Id*. at 82.

She has difficulty lifting a gallon of milk.  *Id*. at 77, 86.  When her hands cramp up from overuse, they remain painful and weak for one to three days afterward.  *Id*. at 81-83.

Her family has two dogs.  She cannot walk them because she is unable to grip a leash.  She does play with them and brush them with a mitt.  Her granddaughter feeds the dogs.  *Id*. at 75-77.

ALJ Lombardo issued a written decision finding that Plaintiff was not under a benefits-qualifying disability.  The Appeals Council affirmed ALJ Lombardo's decision, leaving ALJ Lombardo's decision as the Social Security Administration's final decision to deny Plaintiff's application for benefits.

### B.    Medical Evidence

Plaintiff first saw hand surgeon Dr. Kim in March 2004 due to a "[s]oft tissue mass of [her] left small finger."  (Doc. #5, *PageID* #487).  The mass had been growing and becoming increasingly painful over several years.  Dr. Kim surgically removed the mass. *Id*. at 482-86.  At her post-surgical follow-up, Dr. Kim described the mass as a benign neoplasm.  Plaintiff reported residual numbness and paresthesia at the tip of her finger.  *Id*. at 481.

On May 15, 2008, Plaintiff underwent an EMG of her upper extremities.  It revealed "residual slowing across [Plaintiff's] bilateral median nerves at the wrists bilaterally...."  *Id*. at 427.

In October 2010, Plaintiff consulted with spinal surgeon Dr. Hoskins primarily for

chronic low-back and neck pain. *Id.* at 703-05. Plaintiff reported that her neck pain had

been radiating down her arms. *Id.* at 703. She also reported diminished dexterity in her

right hand and "difficulty with grasping and weakness" greater in her left hand. *Id.*

Dr. Hoskins' examination revealed tingling (paresthesia) in Plaintiff's bilateral

ulnar-nerve distributions, generalized weakness in her upper extremities, and decreased

sensation in the C5-6 nerve distribution of her left arm. *Id.* at 703-04. He explained:

> As far as the neck is concerned, she does have evidence of central
> spinal stenosis at C5-6 and C6-7 levels with degenerative disc disease at C5-
> 6. This appears to be impinging on the spinal cord and surrounding nerves
> as well, which would most likely produce her arm symptoms and possibly
> lower extremity symptoms to some degree as well.

*Id.* at 704. In late December 2011, Dr. Hoskins performed a surgical fusion of Plaintiff's

C5-6 and C6-7 in vertebrae. *See id.* at 705. In March 2011, ten weeks after surgery, Dr.

Hoskins observed that Plaintiff was having tightness in her neck and headaches. He also

noted:

> She is still having some numbness in her hands too but again she has had
> carpal tunnel in the past. I tested her again with Tinel's and one tap and she
> had pain in her fingers, so I think that she probably has a recurrence of that.
> We are likely dealing with more of a double crush issue. I would like her at
> least evaluated by one of our doctors to see about the possibility of treatment
> for that.

*Id.* at 699. In general, when carpal tunnel syndrome involves a "double crush issue,"

problems arise in two different areas of the body:

> Double crush ... refers to the presence of nerve irritation at two locations
> along the path of a nerves. Nerves in our body leave our spine and travel
> through the body to their final destinations. Thus, nerves leaving the neck,

7

> or cervical, spine become nerves that innervate the wrist.  Double crush
> means that irritation at one site, such as the neck, causes enough damage to
> make the same nerve more susceptible to damage elsewhere, such as the
> wrist.  For carpal tunnel syndrome, a pinched nerve leaving the neck, as seen
> in cervical radiculopathy, may require less pinching of the median nerve in
> the wrist to produce painful symptoms than would otherwise be expected if
> the nerve was only pinched at one location.

http://www.spinemd.com/symptoms-conditions/carpal-tunnel-syndrome.

Returning to the medical records, Plaintiff saw Dr. Hodges in April 2011, upon

referral from Dr. Hoskins.  *Id*. at 706-08.  Dr. Hodges examined Plaintiff, and his

diagnostic impressions included cervical myelopathy; cervical spinal stenosis status post-

decompression surgery; bilateral hand pain, "question hyperalgesia from reinnervation";

and fibromyalgia.  *Id*. at 708.  He recommended a complete rheumatology workup, a

possible course of trigger point injections, physical therapy, and possibly a TENs unit. *Id*.

On May 4, 2011, Plaintiff returned to Dr. Kim for a second opinion regarding her

hands.  *Id*. at 716.  Dr. Kim noted that Plaintiff was previously diagnosed with carpal

tunnel syndrome and underwent bilateral carpal tunnel releases sometime in the 1980s."

*Id*. at 716.  He observed that Plaintiff had "well healed scars at the base of both palm [are]

consistent with prior carpal tunnel releases...."  *Id*.  Plaintiff informed Dr. Kim about the

numbness and tightness throughout both of her hands.  *Id*.  He performed a comprehensive

examination of Plaintiff's hands, observing that she had, mild bilateral wrist flexor

tenosynovitis; "strongly positive" bilateral Tinel's signs at Plaintiff's carpal tunnels;

positive carpal tunnel compression tests; positive Phalen's testing, which produced

8

paresthesia in the index, long, ring, and small fingers of both hands; paresthesia upon compression of her bilateral Guyon's canals in all of her digits; and mildly positive Tinel's signs at her cubital tunnels. *Id*. Dr. Kim further found that Plaintiff exhibited "global weakness with manual motor testing in [her] upper extremities, bilaterally...." *Id*. Dr. Kim opined that Plaintiff "could have double crush syndrome with simultaneous cervical radiculopathy and peripheral nerve entrapment...." *Id*.

Dr. Kim recommended EMG testing, which was performed on May 17, 2011. *Id*. at 717-19. The EMG revealed prolonged medial motor distal latencies in Plaintiff's wrists as well as prolonged median sensory distal latency in her left hand and borderline latency on her right. *Id*. at 717. Positive sharp waves in the abductor pollicis brevis muscles were also recorded in her bilateral upper extremities with a mild decrease in recruitment. The diagnostic impressions included "moderately severe bilateral median neuropathies at the wrist (carpal tunnel syndrome)…" *Id*.

In June 2011, Plaintiff returned to Dr. Kim to discuss the EMG test results. *Id*. at 763. She reported that numbness throughout her entire hand in both upper extremities. She exhibited "global weakness with manual motor testing throughout both upper extremities, grade 4/5." *Id*. Dr. Kim noted, "Electrodiagnostic studies were done by Dr. Seymour on 5/17/11 demonstrating findings consistent with moderate bilateral carpal tunnel syndrome." *Id*. Dr. Kim recommended injections and hand therapy. He injected Plaintiff with a combination of Celestone and Lidocaine into each hand.

Plaintiff's next follow-up with Dr. Kim was on July 18, 2011.  She indicated that after her injections in June 2011, she experienced some improvement in her symptoms. *Id*. at 762.  Dr. Kim's physical examination found mild bilateral wrist flexor tenosynovitis and mildly positive provocative maneuvers at her carpal tunnels bilaterally. *Id*.  Dr. Kim instructed Plaintiff to return if her symptoms regressed.  She did so in September 2011 when Dr. Kim noted that her symptoms had initially improved with injections but had subsequently recurred.  *Id*. at 761.  Dr. Kim observed positive Tinel's signs at Plaintiff's bilateral carpal tunnels as well as positive bilateral carpal compression and Phalen's tests. *Id.* at 761.  His impression was recurrent bilateral carpal tunnel syndrome.  He explained:

> While some of her symptoms are due to recurrent carpal tunnel syndrome I do think some of her symptoms are due to cervical spine issues as well. She is limited with respect to her ability to do repetitive or forceful gripping and grasping, and repetitive wrist motion. I think she could be reasonably expected to do repetitive manipulation or handling on an occasional basis, up to one-third of the workday.

*Id*.

On September 12, 2011, Dr. Kim also completed a brief "Questionnaire Regarding [Plaintiff's] Handling And Fingering Limitations."  *Id*. at 756.  He opined that Plaintiff's carpal tunnel syndrome might affect her ability to hand or finger.  He further opined that during a workday, Plaintiff could "occasionally" engage in handling or fingering, meaning 1/3 of an eight-hour workday.  *Id*.  Dr. Kim based his opinion about Plaintiff handling and limiting restrictions on his own clinical testing and observations and Plaintiff's EMG report dated 5/17/11.  *Id*. (referring to EMG test results on *PageID* #s 717).

10

The administrative record contains additional medical records along with opinions from other medical sources.  A detailed description of those records and opinions is unnecessary because the undersigned has reviewed the entire administrative record and because both the ALJ, Plaintiff's counsel, and the Commissioner's counsel have accurately referred to the pertinent records concerning Plaintiff's impairments and work limitations with citations to specific evidence.

III.   <u>**"Disability" Defined and the ALJ's Decisions**</u>

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job.[2]  42 U.S.C. § 423(d)(1)(A); *see Bowen*, 476 U.S. at 469-70.

ALJ Lombardo reviewed the evidence under the Steps one through four of the Social Security Administration's five-step sequential evaluation.  *See* 20 C.F.R. §404.1520(a)(4).  She concluded in pertinent part:

Step one:     Plaintiff had not engaged in substantial gainful activity after the date on which her claimed disability began (March 10-2, 2008) through

---

[2] In addition, the impairment must be one "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

the date she was last insured for DIB (March 31, 2012).

Step two:      She had the severe impairments of degenerative disc disease, myofascial pain syndrome, fibromyalgia, and carpal tunnel syndrome.

Step three:    Her impairments or combination of impairments did not meet or equal the criteria in the Commissioner's Listing of Impairments, specifically comparing her impairments against Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), and 11.14 (peripheral neuropathies).

Step four:     Her residual functional capacity, or the most she could do in a work setting despite her impairments,[3] consisted of her ability "to perform light work ... with the following limitations: occasional overhead reaching bilaterally; occasional stooping, crouching, kneeling, and crawling; and frequent fingering and handling bilaterally.

*Id*. at 44-55.

The ALJ continued her Step-four evaluation and found that in light of Plaintiff's residual functional capacity and the vocational expert's testimony, *id*. at 88-89, Plaintiff could perform her past relevant work as a receptionist/clerk through the date she was last insured for DIB, and thus she was not disabled under the Act.  *Id*. at 55-56.  Upon reaching this dispositive finding at Step four of the sequential evaluation, ALJ Lombardo did not reach Step five of the sequential evaluation and, consequently, made no finding about whether a substantial number of jobs existed in the national economy that Plaintiff could perform.

―――――――――――――

[3] *See* 20 C.F.R. § 404.1545(a); *see also Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002).

## IV.   **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . " *Rogers*, 486 F.3d at 241; *see Gentry*, 741 F.3d at 722.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

13

follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.     Discussion

### A.     Dr. Kim and Plaintiff's Handling and Fingering Limitation

The ALJ found that Dr. Kim's "opinion is not entitled to controlling or deferential weight under the Regulations...." (Doc. #5, *PageID* #55). The ALJ further found that Plaintiff could perform jobs that require "frequent fingering and handling" and that this "adequately accounts for the claimant's bilateral carpal tunnel syndrome." *Id*.

Plaintiff contends that the ALJ failed to properly weigh Dr. Kim's opinion. As noted above, *supra*, §II(B), treating specialist Dr. Kim concluded that Plaintiff was limited to occasional handling and fingering, meaning 1/3 of an eight-hour workday. Plaintiff also challenges the ALJ's assessment of her residual functional capacity, particularly the ALJ's conclusion that she has the ability to frequently engage in handling and fingering. This conclusion, Plaintiff argues, is not legitimately based on any evidence in the record and the ALJ should have found her limited to occasional handling and lifting.

The Commissioner argues that the ALJ properly evaluated Dr. Kim's opinion (1) by relying on ALJ Bowen's previous evaluation of the May 2011 EMG report; (2) by finding it unsupported by objective signs and findings; (3) by finding that Dr. Kim's treatment

14

notes did not support his opinion; (4) by recognizing that Dr. Kim attributed some of

Plaintiff's symptoms to her cervical problems, rather than carpal tunnel syndrome; (5) by

referring to Dr. Hodge's relatively normal treatment notes and Plaintiff's conservative-

treatment history and wide range daily activities.

Social security regulations recognize several different categories of medical

sources: treating physicians, nontreating yet examining physicians, and nontreating yet

record-reviewing physicians. *Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th

Cir. 2013).

> As a general matter, an opinion from a medical source who has
> examined a claimant is given more weight than that from a source who has
> not performed an examination (a "nonexamining source"), and an opinion
> from a medical source who regularly treats the claimant (a "treating
> source") is afforded more weight than that from a source who has examined
> the claimant but does not have an ongoing treatment relationship (a
> "nontreating source").  In other words, "[t]he regulations provide
> progressively more rigorous tests for weighing opinions as the ties between
> the source of the opinion and the individual become weaker." Soc. Sec.
> Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1), (d) (eff. April

1, 2012)).

A treating source's opinion may be given controlling weight under the treating

physician rule only if it is both well supported by medically acceptable data and not

inconsistent with other substantial evidence of record.  *Gayheart*, 710 F.3d at 376; *see* 20

C.F.R. §404.1527(d)(2) (eff. April 1, 2011).  "If the Commissioner does not give a

treating-source opinion controlling weight, then the opinion is weighed based on the

15

length, frequency, nature, and extent of the treatment relationship, as well as the treating

source's area of specialty and the degree to which the opinion is consistent with the

record as a whole and is supported by relevant evidence." *Gayheart*, 710 F.3d at 376

(citing 20 C.F.R. § 404.1527(c)(2)-(6) (eff. April 1, 2012).

ALJ Lombardo discounted Dr. Kim's opinion on the ground that "the prior decision

[by ALJ Bowen] adequately considered the examination findings and May 2011 EMG

report, and the Appeals Council indicated no fault with this evaluation."  (Doc. #5, *PageID*

#55).  In her previous decision, ALJ Bowen acknowledged that Plaintiff's carpal tunnel

syndrome was confirmed by EMG on May 15, 2008.  *Id.* at 145 (citing *PageID* #427).

ALJ Bowen also observed:

> An EMG and nerve conduction study on May 17, 2011, showed only
> moderately severe bilateral median neuropathies at the wrist with only mild
> motor unit dropout....

*Id.* (citing *PageID* #717).  ALJ Bowen viewed this EMG as part of the objective evidence

that she found "not consistent" with Plaintiff's argued-for limitation to occasional

handling and fingering.  *Id.*

The problem here is that ALJ Lombardo overlooked or ignored the fact that the

record ALJ Bowen reviewed did not have Dr. Kim's September 2011 opinion.  This is

significant because Dr. Kim based his September 2011 opinion – that Plaintiff was limited

to occasional handling and fingering – on the May 17, 2011 EMG.  *Id.* at 756.  As a result,

there is a conflict in the record between ALJ Bowen's opinion and Dr. Kim's opinion over

the meaning of the May 17, 2011 EMG results.  Because ALJ Bowen did not have the benefit of Dr. Kim's opinion at the time of her review, it was not reasonable for ALJ Lombardo to rely on ALJ Bowen's review of these EMG results.  Substantial evidence therefore fails to support ALJ Lombardo's finding that ALJ Bowen "adequately considered" the results of the May 2011 EMG.

ALJ Lombardo also discounted Dr. Kim's opinion as "unsupported by objective signs and findings in the preponderance of the record."  *Id*. at 55.  ALJ Lombardo reasoned, "the examination findings documented by Dr. Kim ... do not support his assessment."  This finding is not supported by substantial evidence.  Dr. Kim's clinical examinations did in fact show "some positive carpal tunnel signs."  *Id*.  Although ALJ Lombardo attempts to downplay the significance of these signs and test results by describing Dr. Kim's examinations as "otherwise normal," this characterization fails to recognize Dr. Kim's observations during treatment sessions that are pertinent to Plaintiff's carpal tunnel syndrome including:

- Healed scars at the bases of both palms consistent with Plaintiff's prior carpal tunnel release surgeries;

- Mild bilateral wrist flexor tenosynovitis;

- "Strongly positive" bilateral Tinel signs at Plaintiff's carpal tunnels;

- Positive carpal tunnel compression tests;

- Positive Phalen's testing which produced paresthesia in the index, long, ring, and small fingers of both hands;

17

- Paresthesia upon compression of Plaintiff's bilateral Guyon's canals in all of her digits;

- Mildly positive Tinel signs at Plaintiff's cubital tunnels; and

- Weakness with manual motor testing in Plaintiff's bilateral upper extremities.

(Doc. #5, *PageID* #716). Other providers observed similar clinical signs. *See id*. at 455, 699, 757-60. Plaintiff's EMG testing has also been consistent with carpal tunnel syndrome. *Id*. at 427-28, 717-19. ALJ Lombardo's election to focus only upon the normal portions of Plaintiff's clinical examinations (portions which were not necessarily related to Plaintiff's carpal tunnel syndrome) to the exclusion of the ample objective evidence consistent with Dr. Kim's conclusions do not support her rejection of Dr. Kim's opinion. *See Germany–Johnson v. Comm'r of Soc. Sec*., 313 Fed Appx. 771, 777 (6th Cir.2008) (finding error where the ALJ was "selective in parsing the various medical reports"); *see also Mukes v. Commissioner*, 946 F.Supp.2d 737, 747 (S.D. Ohio 2013) ("In the case at bar, the ALJ erred in selectively reading the record and making conclusions that constituted a 'cherry picking' of evidence, designed to produce the result of a negative finding. The ALJ did not consider 'all relevant evidence' as is required, but erroneously relied instead only on that information supporting her final conclusion.").

ALJ Lombardo also erred to the extent she substituted her own lay opinion in place of Dr. Kim's medical opinion about the May 2011 EMG results. Dr. Kim interpreted those EMG results as evidence supporting his conclusion that Plaintiff was limited to occasional

handling and fingering.  *Id*. at 756.  It was therefore necessary for the ALJ to rely on

medical evidence, such as another medical source opinion, in order to reasonably conclude

that the May 17, 2011 EMG results were inconsistent with, or failed to support, Dr. Kim's

opinion.  "[A]n ALJ 'may not substitute his own medical judgment for that of the treating

physician where the opinion of the treating physician is supported by the medical

evidence.'" *Simpson v. Comm'r of Soc. Sec*., 344 Fed App'x. 181, 194 (6th Cir. 2009)

(quoting, in part, *Meece v. Barnhart,* 192 Fed Appx. 456, 465 (6th Cir. 2006)) (citing

*Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (stating "ALJs must not succumb to the

temptation to play doctor and make their own independent medical findings")).

ALJ Lombardo additionally noted, "Dr. Kim also indicated that he thought

[Plaintiff's] symptoms were more likely associated with her cervical problem, rather than

carpal tunnel syndrome."  (Doc. #5, *PageID* #55 (citing *PageID* #s 761-64)).  Here, the

ALJ misconstrued Dr. Kim's statement.  Dr. Kim did not indicate that Plaintiff's

symptoms were "more likely" associated with her cervical problem "rather than carpal

tunnel syndrome."  Instead, Dr. Kim stated, "[w]hile some of her symptoms are due to

recurrent carpal tunnel syndrome[,] I do think that some of her symptoms are due to

cervical spine issues as well...." *Id*. at 761.  Dr. Kim thus thought that Plaintiff had some

symptoms related to carpal tunnel syndrome and some symptoms related to her cervical

issue "as well." *Id*.  This is the plain meaning of his statement, which was not contrary to

his opinion that Plaintiff's symptoms from carpal tunnel syndrome restricted her to

19

occasional handling and fingering.  In addition, Dr. Kim's opinion about these two areas of problems is consistent with Dr. Hoskins' thoughts after he performed Plaintiff's cervical-fusion surgery.  Dr. Hoskins indicated, "We are likely dealing with more of a double crush issue...."  *Id*. at 699.  Dr. Hoskins' opinion about a likely double-crush issue refers, by definition, to a connection (through a single nerve) between Plaintiff's cervical problems and carpal tunnel syndrome.  *See supra*, §II(B).  This sheds light on a possible cause of Plaintiff's carpal tunnel syndrom and is consistent with Dr. Kim's statement about Plaintiff's problems in both areas of her body.

ALJ Lombardo also found that Dr. Kim's opinions are due little weight because Plaintiff "was observed at the January 2013 hearing to be holding a Kleenex and papers with her hands."  *Id*. at 55.  The ALJ's reliance on these facts to discount Dr. Kim's opinion was not reasonable given the tiny weight and mass of a Kleenex and the lack of specific information about the amount of papers Plaintiff was holding.  Indeed, a reasonable mind would not accept this evidence to discount Dr. Kim's opinion or to support the ALJ's conclusion that Plaintiff could perform jobs requiring frequent handling and lifting.  It is, instead, more indicative of an ALJ improperly straining to find evidence to support a non-disability conclusion.

The ALJ also placed great weight on the opinions of physicians who reviewed the record at the request of the Ohio Bureau of Disability Determinations.  (Doc. #5, *PageID* #54).  Yet, these consultants reviewed only a small fraction of the administrative record's

evidence, which did not contain the ample carpal tunnel related evidence currently in the administrative record, nearly five-and-a-half years ago. *Id.* at 460-67, 478. There is nothing in their opinions to indicate that they were aware Plaintiff has a history of carpal tunnel syndrome, and there is no analysis about the limitations occasioned thereby. *Id.*

The Commissioner contends that even if the ALJ erred in not crediting Dr. Kim's opinions, the error was harmless due to the vocational expert's testimony during ALJ Lombardo's hearing. The Commissioner relies on the vocational expert's testimony that a hypothetical person with Plaintiff's limitation, including occasional handling and fingering, could perform the job of surveillance system monitor and that a significant number of such jobs exist in the State of Ohio (2,020) and in the Dayton area (160). This testimony does not establish harmless error. The ALJ's errors in rejecting Dr. Kim's opinion were not harmless because, if credited, Dr. Kim's opinion – Plaintiff is limited to occasional handling and fingering – would have first led to the conclusion that Plaintiff could not perform her past relevant work as a receptionist clerk. This would have been a reasonable, evidence-based conclusion because the vocational expert testified earlier in the hearing that a person limited to occasional handling and fingering could not perform the job of receptionist clerk. (Doc. #5, *PageID* #s 88-90). In contrast, the ALJ's rejection of Dr. Kim's opinion led the ALJ in the opposite direction. She found that Plaintiff could engage in frequent handling and fingering, and she therefore could perform her past relevant work as a receptionist clerk. This was the keystone in the ALJ's conclusion that

Plaintiff was not under a benefits-qualifying disability.  Because the ALJ could not have reached this conclusion without first rejecting Dr. Kim's opinion, the ALJ's errors in evaluating Dr. Kim's opinion were not harmless.

The record, moreover, does not reveal harmless error because the vocational expert who testified during ALJ Bowen's hearing (in 2011) unequivocally opined that the limitation to occasional handling and fingering would eliminate both light and sedentary jobs, for a person with Plaintiff's limitations.  (Doc. #5, *PageID* #125).  In contrast, the vocational expert's testimony during ALJ Lombardo's hearing (in 2013) was equivocal and, at times, uncertain or inconsistent.  *See id*. at 88-97.  At first she testified that there would be no jobs involving light unskilled work with non-exertional limitations, although it is not certain from the ALJ's questions which non-exertional limitations they were considering.  *See id*. at 91-92.  The vocational expert testified that "when you specify the handling and fingering, that eliminates quite a few of them [meaning, unskilled light jobs in Ohio]."  *Id*. at 92.  When given a chance to conduct research during a recess (probably computer research), the vocational expert identified the jobs of election clerk and surveillance system monitor.  *Id*. at 92-93.  When ask about the number of those jobs for a person limited to occasional handling and fingering, the vocational expert testified, in part:

> We have election clerk..., and the state data is 8,650.  And, of course, the surveillance systems monitor it actually has very limited of those.  And let's see.  There are 2,020 jobs in the local market or in the state labor market 2,020.  And it's going to take me a minute to find occasional for all three – for both of those [jobs, presumably].  I'm really not finding anything that is only occasional and I've got surveillance systems monitor and

> election clerk but I'm not finding.  Just right off hand I could probably
> submit additional positions to the file but there are not many jobs out there
> that don't require at least frequent handling....  And fingering.

*Id*. at 93-94.  The vocational expert later acknowledged that the elections clerk jobs are
temporary short-term jobs.

When asked what the fingering and handling requirements were for the surveillance
systems monitor jobs, the vocational expert equivocated, "It's occasional I know.  Oh, no,
it's – none...."  *Id*. at 94.  The vocational expert stated that there were 2,020 surveillance-
system-monitor jobs in the State of Ohio.  Yet, she equivocated again by testifying, based
on her job-placement experience, "[I]t's very difficult in today's labor market to find
employment without a GED."  *Id*. at 96.

Given these weaknesses in vocational expert's testimony during ALJ Lombardo's
hearing, along with a lack of clarity in the ALJ's questioning, *see id*. at 91-92, it is
questionable whether this vocational expert's testimony would satisfy the Commissioner's
burden at Step five "to identify a significant number of jobs in the economy that
accommodate the claimant's residual functional capacity ...."  *Jones v. Comm'r of Soc.
Sec*., 336 F.3d 469, 474 (6th Cir. 2003).  This is all the more so due to the presence in the
record of the other vocational expert's testimony during ALJ Bowen's hearing that there
would be no light or sedentary jobs for a person with the limitation to occasional handling
and fingering.  (Doc. #125, *PageID* #125).  For these reasons, ALJ Lombardo's errors
were not harmless.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

## B.    <u>Remand for Benefits</u>

Under sentence 4 of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence 4 may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky*, 35 F.3d at 1041.  "Generally, benefits may be awarded immediately 'only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.'" *Kalmbach v. Comm'r of Soc. Sec.,* 409 Fed. App'x 852, 865 (6th Cir. 2011) (quoting, in part, *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)).  "A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Faucher*, 17 F.3d at 176.

In the present case, a remand for award of benefits is warranted because the evidence of Plaintiff's disability is strong while contrary evidence is lacking.  Treating specialist Dr. Kim's opinion that Plaintiff is limited to jobs involving occasional handling and fingering is entitled to controlling or deferential weight because the record lacks meaningful probative evidence or analysis to the contrary.  Additionally, Dr. Kim's opinion combined with the vocational expert's testimony during ALJ Bowen's hearing that no jobs would be available for a hypothetical person with Plaintiff's limitations, age,

education, and limitation to occasional handling and fingering constitute strong evidence in favor of the finding that Plaintiff is under a disability.  The equivocal testimony by the vocational expert during ALJ Lombardo's hearing is weak because it fails to stand up to the vocational expert's unequivocal testimony during ALJ Bowen's hearing.  The Commissioner has therefore not met her burden at Step five "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity ...." *Jones*, 336 F.3d at 474.  In addition, there is no reasonable justification to delay an award of benefits while the matter is remanded for further proceedings before a third ALJ and a third decision when this would cause further delay in a case already more than five years old.

Accordingly, a reversal of the ALJ's decision and a remand for payment of benefits are warranted.

## IT IS THEREFORE RECOMMENDED THAT:

1.   The Commissioner's non-disability finding be reversed;

2.   This matter be remanded to the Social Security Administration for payment of Disability Insurance Benefits to Plaintiff Tamala Masters; and

3.   The case be terminated on the docket of this Court.


January 29, 2016

s/Sharon L. Ovington
Sharon L. Ovington
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).